51 CCPA

**Application of Robert R. CITRON.**

**Patent Appeal No. 7030.**

United States Court of Customs
and Patent Appeals.

Jan. 23, 1964.

James H. Littlepage, Washington, D. C. (Herman Hersh, Ooms, McDougall & Hersh, Chicago, Ill., of counsel), for appellant.

Clarence W. Moore, Washington, D. C. (Raymond E. Martin, Washington, D. C., of counsel), for Commissioner of Patents.

Before WORLEY, Chief Judge, and RICH, MARTIN, SMITH, and ALMOND, Judges.

RICH, Judge.

This appeal is from the decision of the Patent Office Board of Appeals affirming the rejection of all claims remaining in appellant's application serial No. 163,787 filed May 23, 1950, for "Method of Implanting Cancer Tissue."

This same application with the same claims (plus others now abandoned) was before us in appeal No. 6276 which we decided January 22, 1958, 251 F.2d 619, 45 CCPA 773, and we refer to the opinion therein to explain the subject matter of the invention.

Subsequent to our former decision, the following events occurred. March 26, 1958, the Patent Office issued a notice of allowance which the Issue and Gazette Branch shortly withdrew on April 9, stating that the examiner would explain the reasons. April 22 the examiner sent appellant a letter in the nature of an office action stating that the application had been reconsidered, citing four new references, and rejecting all claims on the ground of unpatentability over the new references for various reasons. October 3 appellant cancelled some claims and amended others and on April 1, 1959, received a final rejection. October 1, 1959, appeal was taken to the Board of Appeals. November 27 appellant cancelled four claims. On March 28, 1962, the board affirmed the examiner's rejection of all pending claims as unpatentable over the references. This appeal followed.

### The Propriety of Reopening the Case

██ Appellant's first challenge is to the effect that the Patent Office has subjected him to "double jeopardy" and urges us to refuse to permit the Patent Office to reopen this case. He complains that the board completely ignored the same plea. It was so clearly within not only the right but the duty of the Patent Office to do what it did that we would follow the board's treatment of the question but for the fact that appellant devotes nearly half of his brief to it, so as

to call at least for summary consideration.

The principles and the law involved were fully treated by the Court of Appeals, District of Columbia, in The Jeffrey Mfg. Co. v. Kingsland, Comr.Pat., 86 U.S.App.D.C. 13, 179 F.2d 35.[1] Appellant discusses this case at length, suggesting that it is "bad law." We do not agree that that opinion states "bad law." We do, however, find three of appellant's assumptions to be seriously in error. The first is that in our former decision in this case we held that the application at bar contained "patentable subject matter" and the other two are that we held the application to be "allowable," thus "directing the United States Patent Office to issue a patent." In deciding appeals from the board in patent cases we do none of these things. All we do is pass on the propriety of rejections brought before us for review. These cases are not of the type in which the concept of "double jeopardy" has any applicability.

While appellant may have just cause for complaint that the Patent Office should have operated more effectively in finding the closest prior art, which appears to have been available to it all during the prosecution, and in citing it early in the prosecution, this is of no moment whatever in deciding appellant's legal right to the appealed claims in the face of the new prior art now that it has been cited.

### Patentability Over the Prior Art

The Patent Office no longer relies for any purpose on any of the references which we considered in our former opinion and held collectively not to be a proper basis for rejection. The newly cited references are:

F. S. Jones, V.M.D. and Peyton Rous, M.D., "On the Cause of the Localization of Secondary Tumors at Points of Injury," Journal of Experimental Medicine, Vol. 20, 1914, pages 404–412. [Hereinafter "Jones et al."]

John J. Kidd, M.D., "Suppression of Growth of Brown-Pearce Tumor Cells by a Specific Antibody," Journal of Experimental Medicine, Vol. 83, 1946, pages 227–229, 236, 245–248.

Elizabeth Jones, "Breakdown of Hereditary Immunity to a Transplantable Tumor by the Introduction of an Irritating Agent," Journal of Experimental Cancer Research, Vol. 10, 1926, pages 435–449.

B. E. Kline, M.S. and H. P. Rusch, M.D., "Some Factors that Influence the Growth of Neoplastic Cells," Journal of Experimental Cancer Research, Vol. 4, 1944, pages 762–767.

A review of appellant's specification brings to the fore the fact that he regarded as his invention broadly the improvement on the known method of simply introducing live cancer tissue into a laboratory animal which resided in "injecting into the peritoneal cavity of each animal [a] suspension of mechanically irritant particles and therewith or thereafter subjecting the animal to an intraperitoneal injection of cancer tissue." The supposed advantages were to increase the number of successful transplants or "takes" and a more rapid rate of growth of the cancer tissue. He described his preferred method of carrying out this invention by a single example after which he pointed out in his specification:

"It will be clear from the foregoing explanation that the disclosed method may be varied substantially from the specific example which has been set forth above by way of illustration. For instance, as already stated, the number and spacing of injections and the quantity of irritant particles introduced may be changed according to the kind or species of animal subjected to the

1. See also In re Pappas et al., 214 F.2d 172, 41 CCPA 989.

method. The type and quantity of cancer tissue employed may also be varied. Again, it does not necessarily follow that only a single pattern of the number, spacing, and volume of injections must be employed for each kind of species of animal."

On the basis of the new references, the Patent Office position is recapitulated by the solicitor's brief as follows: "* * * the Patent Office position is that (a) none of the references constitutes an anticipation, (b) that Jones et al. is the most pertinent reference in that it positively teaches injecting irritant particles followed by an injection of cancer tissue, (c) that repeated injection of irritant particles involves a mere duplication of steps without change of function, especially since after the injection of irritant particles by Jones et al., 'the irritant particles were already present, and the quantity is not critical', and (d) that Jones or Kline would suggest to one of ordinary skill in the art that the injection of irritant particles, taught by Jones et al., be repeated as often as desired."

Later on, the solicitor's brief states: "In fact, it is quite clear that the failure to include irritant particles along with the second recited injection is all that keeps Jones et al. from constituting a complete anticipation of the method of claim 13." [2]

We have read the new references and have considered appellant's arguments relating thereto. We feel that the board was correct in its conclusions as expressed in the following excerpt from its well-reasoned opinion:

"Claims 6 through 9 and 13 through 16 have been rejected as unpatentable over the Jones et al. article in the Journal of Experimental Medicine 1914. Claims 2, 17 and 18 specific to the injection of rabbits and reciting definite quantities of agents (claims 2 and 18 additionally being limited to use of Brown-Pearce cancer tissue) stand rejected as unpatentable over Jones et al. in view of Kidd who is merely relied upon to show the use of this specific tumor tissue and the equivalence of rabbits, mice and rats in this experimental work. Since appellant denies any patentable novelty in either the particular cancer cells or the species of animal used, the Kidd article need not further be discussed.

\* \* \* \* \* \*

"It is the Examiner's position that inclusion of the irritant particles with the cancer cells in the final injection is an immaterial or arbitrary limitation since the irritant particles are already present and the quantity is not critical. Further, that the use of repeated injections is merely duplication of steps without change of function.

"Upon careful review of the record in this case, including appellant's most recent arguments, it is our conclusion that this rejection of all claims should be sustained. Appellant contends that most significant is the lack of a showing by Jones et al. that there is an accelerated growth rate or a good yield resulting from their experimental techniques and that the reference does not show that a high percentage of 'takes' occurs. There is no basis for these contentions. Not only is the problem of 'takes' recognized (p. 404, 2nd par. last line), the specific portions of the reference we have referred to contradict each of appellant's allegations. The experi-

2. Claim 13 reads:
"A method of implanting cancer tissue in an experimental animal which comprises injecting into the peritoneal cavity of the animal a suspension of fine mechanically irritant particles, and after an interval sufficient to avoid foreign body shock to the animal injecting into the peritoneal cavity a suspension of said particles combined with finely divided living cancer tissue."

mental data, for example, shows a larger percentage of 'takes' and page 410 shows the more rapid and abundant growth of the injected neoplasm.

"The further contention that the theme behind the work of Jones et al. is a determination of the cause of cancer rather than providing an implant method for growing cancer cells in animals is of little significance if the reference teaches appellant's method and results and which, as indicated above, we think it does.

"The charge is also made that the Examiner has 'sloughed over the importance of applicant's steps of using repeated injections and/or combining the cancer tissue with the finely divided irritant.' Not only do we agree with the Examiner that repeated injection is merely obvious duplication but in this appellant is merely following procedure well known in this art as indicated by Jones in Journal of Experimental Cancer Research (1926), page 437, involving repeated inoculations with tumor cell suspensions containing irritating agents and even specifically introduced irritant with the cancer cell suspension, as shown on page 439; and by Kline et al.'s repeated and periodic irritation of the tissue 1 to 5 times, as shown on page 763 of their article in Journal of Experimental Cancer Research (1944). Furthermore, as to the simultaneous injection of the irritant particles along with the cancer cells, there is no evidence of record that this produces an improved result as compared with the use of a cancer cell suspension alone for the final injection following previous injections of mechanically irritant particles.

"The assertion on pages 12 and 13 of appellant's brief that despite the age of the Jones et al. article it remained for many years following the practice to simply use conventional implant methods without injection of irritant particles is not conclusive as to what this reference teaches or whether the claims on appeal patentably distinguish therefrom. In our view the Jones et al. article constitute[s] a very substantial anticipation of appellant's proposal and, in our opinion, bridges the gap that the Court of Customs and Patent Appeals found in the prior art applied to similar claims in the earlier appeal."

Appellant's brief concludes by arguing that the board addressed itself only to the broad concepts of the invention and that certain of the claims contain specific limitations not met by the references, such as specific amounts of materials, specific irritant particle size, and a specific strain of live cancer tissue. While it is quite true that such limitations are to be found in some of the claims, it seems to us a sufficient answer to refer to the statements in appellant's specification, above quoted, which make it clear that these details are no more than details, culled from the specific example in the specification and lacking in patentable significance because well within the skill of the art. None is critical according to appellant's own disclosure of the invention.

The decision of the board is affirmed.

Affirmed.

SMITH, Judge (concurring).

In concurring with the result reached in this case, I do so solely because the appealed claims are not allowable over the art *now* cited. I do not join the majority opinion because of my reservations about the significance which we should accord to The Jeffrey Mfg. Co. v. Kingsland, Comr.Pat., 86 App.D.C. 13, 179 F.2d 35 (1949), which the majority cites as fully treating the principles and law involved in "The Propriety of Reopening the Case."

Partial support for the position of the court in the Jeffrey case was found in Postum Cereal Co. v. Calif. Fig Nut Co., 272 U.S. 693, 47 S.Ct. 284, 71 L.Ed. 478 (1927). To whatever extent the

policy aspects of the Jeffrey case depend on the Postum case, they should now be reconsidered in view of Glidden Company v. Zdanok, 370 U.S. 530, at page 577, 82 S.Ct. 1459 at pages 1486, 1487, 8 L.Ed.2d 671 (1962), which points out:

> "At the time when Postum was decided, the proceeding in equity against the Patent Office was cumulative rather than alternative with the review by appeal, and it seems likely that it was this feature of the statute which caused the Court to characterize the judgment of the Court of Appeals as 'a mere administrative decision.' 272 U.S., at 698 [47 S.Ct. at 285, 71 L.Ed. 478]. Thereafter Congress made the remedies alternative, Act of March 2, 1927, c. 273, § 11, 44 Stat. 1335, 1336, and it was this amended jurisdiction that it later transferred to the Court of Customs and Patent Appeals, renaming the court in the process. Act of March 2, 1929, c. 488, 45 Stat. 1475."

By reason of the statutory changes enacted since the Postum decision, which are referred to in the Zdanok decision, the adjudications of this court now have a finality which was not possessed by the decisions of our predecessor court at the time of the Postum case. Now, an appeal here is an alternate remedy and an applicant is bound by our decision.

It seems to me that the Jeffrey case in giving the Patent Office the right to reopen and in effect relitigate issues which were or could have been determined in a prior appeal, must have been predicated upon the earlier cumulative nature of the appellate proceeding in this court. Thus, in the Jeffrey case, a

decision of the United States Court of Customs and Patent Appeals was characterized as

> "* * * simply an instruction, which the Commissioner must follow, regarding the particular points involved in the appeal. We are supported in this view by the Supreme Court in Postum Cereal Company v. California Fig Nut Company, 1927, 272 U.S. 693, 698, 47 S.Ct. 284, 285, 71 L.Ed. 478." * * *

I agree fully with the majority that the concept of "double jeopardy" raised by appellant is not applicable here. I likewise agree with the majority that appellant does indeed have "just cause for complaint that the Patent Office should have operated more effectively in finding the closest prior art * * * and in citing it early in the prosecution * * *."[1]

The Patent Office is an administrative agency charged by Congress with the task of carrying out the public policy expressed in Article 1, Section 8, of the Constitution. Decisions of the Patent Office in the discharge of its duties are subject to judicial review. Thus, it seems to me, the same judicial doctrines which are applied to private litigants in furtherance of the public policy of bringing an end to legal proceedings after a final determination of issues which were or could have been raised therein should likewise apply to Patent Office proceedings. In Internation Union of Mine, Mill and Smelter Workers, Locals No. 15 v. Eagle Picher Co., 325 U.S. 335, 340–341, 65 S.Ct. 1166, 89 L.Ed. 1649 (1945), Mr. Justice Roberts expressed this concept as follows:

> "Finality to litigation is an end to be desired as well in proceedings to which an administrative body is

1. It is commendable that the Patent Office now seems to have recognized the inherent injustice in the practice which resulted in the present appeal. In the notice of Acting Commissioner Reynolds dated July 26, 1962 (781 O.G. 1) dealing with "New Examining Procedures," it is encouraging to note his statement that under the new procedures now in effect "The first action by the Office in every case is made thorough, clear and complete." Had this been the situation when the first action was entered in the application here in issue, it is probable the rights of applicant could have been finally adjudicated in his prior appeal.

a party as in exclusively private litigation. The party adverse to the administrative body is entitled to rely on the conclusiveness of a decree entered by a court to the same extent that other litigants may rely on judgments for or against them. * * *

" * * * [W]e have allowed the Board great latitude in devising remedies which it deems necessary to effectuate the purposes of the Act. But it is not we who essay to interfere with the discretion of an administrative body; it is the Board which is seeking to vacate a court order. The Board had exercised its discretion and devised a remedy. * * * What the Board complains of is that it is not permitted to exercise its admittedly wide discretion a second time, or any number of times it may choose.

"Administrative flexibility and judicial certainty are not contradictory; there must be an end to disputes which arise between administrative bodies and those over whom they have jurisdiction." * * *

My concurrence in the result reached by the majority is essentially based, however, on the pertinent observation and admonition of Mr. Justice Frankfurter, prior to the Eagle Picher decision, in Federal Communications Commission v. Pottsville Broadcasting Co., 309 U.S. 134, 146, 60 S.Ct. 437, 84 L.Ed. 656 (1940):

"It is, however, urged upon us that if all matters of administrative discretion remain open for determination on remand after reversal, a succession of single determinations upon single legal issues is possible with resulting delay and hardship to the applicant. It is always easy to conjure up extreme and even oppressive possibilities in the exertion of authority. But courts are not charged with *general guardianship* against all potential mischief in the complicated tasks of government."
* * * (Emphasis added.)

I have emphasized the words "general guardianship" in the above-quoted passage, because I feel they answer appellant's contention in the instant case. His argument would in effect require us to be charged with *general guardianship* against all potential mischief to an applicant which reopening of prosecution by the Patent Office might produce. In here rejecting appellant's contention, I do not think we should preclude ourselves from adopting the view of the Eagle Picher case, should we be confronted with instances where the Patent Office, under the aegis of such decisions as the Jeffrey case, seeks to exercise its discretion a second time (or such number of times as it may choose) and thus in effect to refuse to be governed by the decision of this court.

Possibly it was reliance upon the rationale of such decisions as the Jeffrey case and the authorities therein cited which encouraged the Patent Office in this case to be less careful in developing the issues on the prior appeal than a private litigant must be. The degree of care required of an applicant is high, in view of the conclusive determination of issues against him resulting from the now alternative character of appeals to this court.

I suggest, therefore, that this court should remain alert to the very real threat to fundamental legal principles which resides in the rationale of the Jeffrey case. We should approach the problem as the Supreme Court did in the Eagle Picher case, to the end that judicial certainty with respect to the proper termination of controversies should be recognized as paramount, in the interest of the public. There must be an end to disputes between administrative bodies and those whose legal rights are determined by such bodies. I do not find a recognition of this principle in the Jeffrey case.