54 CCPA

**Application of Heinrich RUSCHIG, Walter Aumuller, Gerhard Korger, Hans Wagner, Josef Scholz and Alfred Bander.**

**Patent Appeal No. 8071.**

United States Court of Customs and Patent Appeals.

June 22, 1967.

Eugene O. Retter, Kalamazoo, Mich., John Kekick (Sidney W. Russell, Washington, D. C., of counsel), for appellants.

Joseph Schimmel, Washington, D. C., for the Commissioner of Patents.

Before WORLEY, Chief Judge, RICH, SMITH, and ALMOND, Judges, and WILLIAM H. KIRKPATRICK.*

* Senior District Judge, Eastern District of Pennsylvania, sitting by designation.

RICH, Judge.

This appeal is from the decision of the Patent Office Board of Appeals affirming the rejection of claim 13 of application serial No. 601,107, filed July 31, 1956, for "New Benzene Sulfonyl Ureas and Process for Their Preparation" Apparently The Upjohn Company has been prosecuting the application.

This case is a sequel to our decision in In re Ruschig, 343 F.2d 965, 52 CCPA 1238, decided April 22, 1965. There we reversed a rejection of twelve claims of this same application based on prior art. The claim on appeal is one of those claims. It reads:

13. N-(p-chlorobenzenesulfonyl) -N'-propylurea. That compound is structurally identified as

$$Cl-\underset{}{\underset{}{\bigcirc}}-SO_2-NH-\overset{\overset{O}{\|}}{C}-NH-CH_2CH_2CH_3.$$

It is known by the generic name chlorpropamide and is sold under the trademark Diabinese by Chas. Pfizer & Co., Inc., as an oral medication for the control of diabetes mellitus, as more fully explained in our previous opinion, wherein we also had occasion to discuss the claim 13 compound which is again before us. We refer to that opinion for a more complete exposition of the chemical nomenclature and further background.

The sole issue on this appeal is whether claim 13 is supported by the disclosure of appellants' application, a question which had not been raised in this case at the time of the prior appeal. The following events gave rise to the issue.

About a year after the present application was filed, the examiner suggested claim 13 to applicants for purposes of interference with a Pfizer application filed by McLamore, serial No. 660,064 of May 20, 1957, and September 25, 1957, the claim was added. Interference 89,-091 was declared and in it McLamore moved to dissolve on the ground, inter alia, that the claim was not supported in the application at bar. The examiner held the claim was supported and denied the motion. On reconsideration, he adhered to his decision. (The suggestion of the claim and these two decisions on

motions are referred to by appellants as three rulings in their favor by the Patent Office, nearly ten years ago, on the present issue.) Later the examiner dissolved the interference on his own motion on the ground claim 13 was unpatentable to the interference parties over prior art. Meanwhile both appellants and McLamore had filed divisional applications claiming methods of treating diabetes and compositions therefor, appellants' application being serial No. 185,865, filed April 9, 1962. It had two sets of claims, 1–4 for tablets and 5–8 for method of treatment. Claims 3 and 7 specified the same compound as that of claim 13. These claims were under rejection by reason of one-year statutory bars which could be overcome only by reliance on the filing date of the present parent application which gave rise to the question whether the application contained support for the claims. In an appeal to the board in application 185,865, by an opinion of March 4, 1965, the board, having gone into the application and interference history, held that claims 3 and 7 in that application did not have support in the present application because the claim 13 compound is not disclosed therein and issued a new rejection under Rule 196(b) on that ground.[1]

1. The board opinion is reported at 147 USPQ 46. After receiving it, appellants cancelled claims 3 and 7 from application 185,865 and patent No. 3,198,706.

After our decision on the prior appeal, in which we reversed the rejection on prior art, the application was returned to the examiner. Since he knew of the board's action in the other application holding that the disclosure does not support the compound of claim 13, he requested and obtained from the First Assistant Commissioner authorization to reopen the case to reject claim 13 on the new ground of lack of support, which he did on June 15, 1965, as follows:

> In view of the decision of the Board of Appeals of March 4, 1965 in Serial No. 185,865, holding that claims 3 and 7 therein were not supported by the disclosure of the instant case and hence not entitled to the benefit of the date thereof, claim 13 herein which is specific to a compound, the use of which is recited in claims 3 and 7, supra, is rejected as having no specific support in this disclosure for reasons fully detailed in said decision (Appeal No. 283–74), Paper No. 25, at pages 4–7. The compound of claim 13 is not named or identified by formula and it can find support only as choices made between the several variables involved. This is not regarded as adequate support for a specific compound never named or otherwise exemplified in the specification as filed. See In re Fried 1963 C.D. 248 (page 257, first paragraph [50 CCPA 954, 312 F.2d 930, 136 USPQ 729]).

Appellants then argued this rejection before the examiner who adhered to it and made it final. Reconsideration was requested and given, the examiner adhering to his view. Appellants then took the question to the board where the examiner filed an extensive Answer to their lengthy brief. The board affirmed for very much the same reasons as those stated in its opinion in deciding the same issue in application serial No. 185,865. Thus the question before us has been twice decided adversely to appellants by

the Board of Appeals, the same panel hearing both appeals.[2]

In coming here, appellants raise a question in addition to the issue of support which requires preliminary consideration. They say that in this second appeal "involving the *same* and already adjudicated Claim, the United States Patent Office was without authority, or lacked jurisdiction, to reopen these proceedings (after the Court's decision) to resurrect a ground of rejection which had already been considered by the Patent Office, this lack of authority being based upon principles of, or akin to, res judicata, estoppel or laches."

In answer, the solicitor says there is no such issue before us since it was not raised before the board, is raised for the first time in this court, and was not properly raised by any reason of appeal. Appellants counter with the argument that Reason of Appeal 9, reading, "The Board of Appeals erred in matters of law," will suffice. They also say that, being a matter of "jurisdiction over subject matter," it can be raised at any time.

We pass these ingenious and technical legal arguments since we prefer to say that we have considered the numerous cases relied on by appellants to support their proposition that the Patent Office cannot make this rejection because many years ago an examiner ruled to the contrary and find the point lacking in merit and unsupported by authority. We appreciate the extensive memorandum of law supplied in the appendix to appellants' brief, containing cases pro and con, and note the heavy reliance on what was said in two concurring opinions. We surmise appellants would have to agree that what precedents they have found are not, as a whole, very strong support for their theory. The words of Judge Garrett in In re Ellis, 86 F.2d 412, 24 CCPA 759, which appellants found quoted in In re Becker, 101 F.2d 557, 26 CCPA 922, fairly depict the present

---

was issued thereon, Aug. 3, 1965, to the assignee Farbwerke Hoechst Aktiengesellschaft vormals Meister Lucius & Bruning.

2. Federico and Rosa, Examiners-in-Chief, and Stone, Acting Examiner-in-Chief; opinions by Federco.

situation, which is not much different from that prevailing in 1936,

> There is nothing unusual, certainly, about an examiner changing his viewpoint as to the patentability of claims as the prosecution of a case progresses, and, so long as the rules of Patent Office practice are duly complied with, an applicant has no legal ground for complaint because of such change in view.

The life of a patent solicitor has always been a hard one.

Appellants insinuate that in our former decision in this case we found all the claims, including claim 13, patentable. Their words are, "Presently appealed Claim 13 was also indicated as allowable by this Court." They also say that this application "was returned by this Court to the Patent Office for issuance * * *." We did neither of these things. We passed on a rejection on prior art, affirmed by the board, found it in error, and reversed the board decision. Nothing more. Under 35 U.S.C. § 144 the only effect of our decision was to govern further proceedings in the case.

■ Appellants concede that the Patent Office can reopen a case returned by this court after appeal and reject claims on newly found prior art and attempt to distinguish the present situation on the ground that the rejection now applied is not based on newly found art but on the specification which has been available since the application was filed. Further, they say the very question was adjudged in their favor long ago. We are unable to see that these differences have legal significance. See In re Citron, 326 F.2d 418, 51 CCPA 869. For related views on res judicata as applied to patent prosecution see our recent opinions in In re Herr, 377 F.2d 610, 54

CCPA ——. We hold the Patent Office had the jurisdiction and the authority to reopen prosecution and to reject claim 13 on a new ground, to the merits of which rejection we now pass.

We have quoted the examiner's rejection above. His first point was that the compound of claim 13 "was not named or identified by formula" in the specification. Appellants admit this. His next point was that it "can find support only as choices made between the several variables involved." These words are the words of Judge Smith in In re Fried, supra, a case in which we found lack of support in general disclosures. Their purport in the factual context of this case is that the reagents for the preparation of chlorpropamide are listed, with many others, in the disclosure and, as the board said, "If the proper choices of the three variables in the above formula are made, the compound in question is produced," the formula referred to being that of the family of benzene sulphonylureas in which the variables are R, $R_1$ and $R_2$, to be seen in claim 1 reproduced in our former opinion. The board continued its statement, saying, "but nowhere in the specification is the particular selection indicated."

■ It does not seem to be contested that the general disclosure of the application encompasses something like half a million possible compounds.[3] It also discloses a number of specific compounds. Appellants' argument is that one skilled in the art would find certain "guides" in the specification which would lead him to the compound of claim 13 and that the compound is therefore disclosed. Further reliance is placed on our opinion in In re Petering, 301 F.2d 676, 49 CCPA 993, taken in connection with original claim 2, legally deemed a part of the disclosure, which appellants say encompasses only 48 compounds, "excluding iso-

---

3. In the companion case of In re McLamore, Cust.Pat.App., 379 F.2d 985, concurrently decided, a PhD. chemist who heads the Pfizer Patent Department has made an affidavit of record in which he shows how he has calculated, on a con-servative basis, including sodium and potassium salts, the number of compounds within the broad disclosure of this application to be 1,237,464. We express no view on this mathematical question. The number is very large in any event.

mers," this being in effect one of the "guides." Original claim 2 reads:

2. Benzenesulphonylureas of the general formula

wherein R is a member selected from the group consisting of chlorine and bromine and $R_2$ is a member selected from the group of alkyl-, alkenyl-, cycloalkyl- and cycloalkylalkyl radicals containing 2 to 7 carbon atoms.

Appellants refer to this formula as narrowing the field of selection, so to speak, and say that "excluding isomers," there are "approximately" 48 compounds within the scope of that claim all of which are "readily determinable by skilled chemists." What this amounts to is saying that skilled chemists can see that R is either Cl or Br and that $R_2$ is any one of the radicals above recited. The examiner computes that the number of possible compounds is not approximately 48 but a minimum of 1,010, "excluding stereoisomerides." He shows his calculations and we do not find a refutation of them by appellants to justify their contention the number is 48, nor any explanation of how the number 48 is arrived at. The *Petering* case is used for its finding that a particular reference disclosure of a subgeneric class of compounds to the number of only 20, some of which were disclosed by name, was as good as *prior art* disclosure of all 20 as though they had all been named, for the purpose of anticipating an invention, not for the purpose of disclosing it to *support* a claim. As we said in our prior opinion in this case, "*Petering* involved a very special situation * * *." We do not consider the facts here to be sufficiently similar to make it pertinent. It is not our view that a disclosure such as that to be found in the formula and words of claim 2, above, amounts to a disclosure, sufficient to support a spe-

cific claim, of every compound a skilled chemist can see is within the scope of that claim. Specific claims to single compounds require reasonably specific supporting disclosure and while we agree with the appellants, as the board did, that *naming* is not essential, something more than the disclosure of a class of 1000, or 100, or even 48, compounds is required. Surely, given time, a chemist could name (especially with the aid of a computer) all of the half million compounds within the scope of the broadest claim, which claim is supported by the broad disclosure. This does not constitute support for each compound individually when separately claimed.

Other "guides" allegedly *leading to* chlorpropamide argued by appellants will now be discussed. It is said eleven processes for making the many compounds of the invention are disclosed, five of which employ an "alkylamine." This is $R_2$ in the general formula. But in that formula there is also the variable R which may be hydrogen, chlorine, bromine, methyl, or methoxy and $R_1$ which may be either chlorine or bromine and, furthermore, R and $R_1$ may be located anywhere on the benzene ring, that is, ortho, meta, or para to the $SO_2$ group and adjacent or non-adjacent one another. This makes for more than a few unidentified possibilities not determined by the use of alkylamine alone. To lead to claim 13, R must be hydrogen and $R_1$ must be chlorine and the alkylamine, $R_2$, must be propylamine.

Next, it is argued in connection with these processes that in the discussion of Process (1) it is taught that the primary amine could be "*a primary butylamine or another primary alkylamine* or an alkenylamine, cyclo-alkylamine or cycloalkylalkyl-amine containing 2 to 7 or 8 carbon atoms" and that one skilled in the art could *see* that "if n-butylamine is a reactant, then ethylamine, n-propylamine, etc., are also possible reactants." We do not see that this guides one *to* the use of n-propylamine. The important words in the quotation from our point of view are "etc." and "possible". It is an old cus-

tom in the woods to mark trails by making blaze marks on the trees. It is no help in finding a trail or in finding one's way through the woods where the trails have disappeared—or have not yet been made, which is more like the case here—to be confronted simply by a large number of unmarked trees. Appellants are pointing to trees. We are looking for blaze marks which single out particular trees. We see none.

Appellants say next that the "guide" becomes more crystallized by the recitation of the alkylamines which can be employed in the four or five reactions described as using them. This list contains at least 19 primary amines which the specification says may be used. Appellants emphasize two, n-butylamine, which is elsewhere specifically disclosed as having been used, and n-propylamine. We do not see that listing the latter with the 18 others adds anything to the initial statement that one may use an alkyl amine containing from 2 to 6 carbon atoms. Propylamine is such an amine but one is not led to it in preference to the others merely by listing them all and identifying it, with the others, by name.

Finally appellants refer to two tables listing, respectively, ten and twelve specific compounds, the first being the list of specific compounds whose blood sugar lowering activity is shown in the specification, the other, which duplicates the first and adds two compounds, being the specific examples of the specification. There is no N'-n-propyl compound among them. Perhaps one of appellants' best points is that the activity table "stresses" compounds in which $R_2$ is a primary alkyl radical, i. e., ethyl, butyl, isobutyl and hexyl. The stress resides in the fact that eight of the ten are such compounds. And one of them, N-(4-chlorobenzenesulphonyl)-N'n-butyl urea, is a homolog of the compound of claim 13. It must be admitted that this is getting close. *If* n-propylamine had been used in making the compound instead of n-butylamine, the compound of claim 13 would have resulted. Appellants submit to us, as they did to the board, an imaginary specific

example patterned on specific example 6 by which the above butyl compound is made so that we can see what a simple change would have resulted in a specific supporting disclosure being present in the specification. The trouble is that there is no such disclosure, easy though it is to imagine it. It is equally easy to imagine that the compound of claim 13 might have been named in the specification. Working backward from a knowledge of chlorpropamide, that is by hindsight, it is all very clear what route one would travel through the forest of the specification to arrive at it. But looking at the problem, as we must, from the standpoint of one with no foreknowledge of the specific compound, it is our considered opinion that the board was correct in saying:

> Not having been specifically named or mentioned in any manner, one is left to selection from the myriads of possibilities encompassed by the broad disclosure, with no guide indicating or directing that this particular selection should be made rather than any of the many others which could also be made.

■ Appellants refer to 35 U.S.C. § 112 as the presumed basis for this rejection and emphasize language therein about *enabling* one skilled in the art to *make* the invention, arguing therefrom that one skilled in the art would be enabled by the specification to make chlorpropamide. We find the argument unpersuasive for two reasons. First, it presumes some motivation for wanting to make the compound in preference to others. While we have no doubt a person so motivated would be enabled by the specification to make it, this is beside the point for the question is not whether he would be so enabled but whether the specification discloses the compound to him, specifically, as something appellants actually invented. We think it does not. Second, we doubt that the rejection is truly based on section 112, at least on the parts relied on by appellants. If based on section 112, it is on the requirement thereof that "The specification shall contain a written description *of the inven-*

*tion* * * *." (Emphasis ours.) We have a specification which describes appellants' invention. The issue here is in no wise a question of its compliance with section 112, it is a question of *fact: Is the compound of claim 13 described therein?* Does the specification convey clearly to those skilled in the art, to whom it is addressed, in any way, the information that appellants invented that specific compound? Having considered the specification in the light that has been shed on it by all the arguments pro and con, we conclude that it does not.

The decision of the board is affirmed.

Affirmed.